Oliver J. NORTHRUP and Klara
Northrup, Appellees,

v.

MILES HOMES, INC. OF IOWA and Land
Contracts, Inc. of Iowa, Appellants.

No. 55147.

Supreme Court of Iowa.

Feb. 21, 1973.

Shea & Jackson by John J. Shea, Cedar Rapids, for appellants.

Simmons, Perrine, Albright & Ellwood by Tom Riley, and James E. Shipman, Cedar Rapids, for appellees.

Heard before MOORE, C. J., and MASON, RAWLINGS, REYNOLDSON and McCORMICK, JJ.

REYNOLDSON, Justice.

Law action tried to jury on causes of action arising out of a pre-cut home sale. Following judgments on plaintiffs' verdicts defendants appeal and we affirm.

In 1968 plaintiffs Oliver J. Northrup (Oliver) and Klara Northrup (Klara), husband and wife, lived on a 60 acre tract they were purchasing on contract near Ely, in Linn County, Iowa. Both had only a seventh grade education. Klara came from Ukraine, Soviet Russia. She was in a concentration camp for three and one-half years, arriving in the United States in 1946. Oliver had been employed by a utility company for 16 years. Prior to that he had worked for a company constructing family residences and believed he could build his own house.

The Northrup house on the homestead tract was very small. Three of their eight children were still at home. Seeking a larger residence, Northrups responded to a local newspaper advertisement described by Klara:

"I saw an add [sic] in the Sunday Gazette on Miles Homes[.] [Y]our land no have to be paid for. Rent sized payment. No money down. Everything furnished for inside and outside, plumbing, wiring and all of that."

They received a catalog, and a credit application which they completed and returned. John Pope, salesman for defendant Miles Homes, Inc. (Miles Homes) then called at the Northrup residence about 6:00 p. m. on April 24, 1968. Oliver and Klara testified they became interested in and selected the

"St. Paul" home described in the catalog which they then had before them:

"The St. Paul. 3-Bedroom Rambler with Rear 'Mud' Closet. This 40' x 26' 3-bedroom rambler is designed for spacious, comfortable living. The large kitchen-dinette area adjoins both living room and bedroom area and is located in the front of the house. Rear entry 'mud' closet keeps house clean. Lots of storage space. NO DOWN PAYMENT. MONTHLY PAYMENTS: $55, including custom kitchen cabinets, plumbing, heating, electrical, tile and paint."

They testified Pope first quoted them a price of $4600 for the "shell" of the St. Paul home, and, at their request, a figure of $6876 as a total price (for materials) including the cabinets, plumbing, heating, electrical, tile and paint. The catalog received by Northrups stated:

"A full and complete price is given to you before you start to build. * * * You know your cost before you start."

The Northrups testified the purchase agreement was read to them by Pope, whom they trusted completely. Pope testified they read this instrument. He denied he told them the contract price was for the "complete package." The purchase agreement was signed by Northrups. It provided for a total payment of $6876, a down payment of $2, and monthly payments of $55 at six percent for three years, at which time Northrups were to secure other financing. Pope also had these buyers sign a blank mortgage note. He asserted (but Northrups denied) they also signed a blank Iowa mortgage form and a blank assignment of their land purchase contract.

Miles Homes is an Iowa corporation with headquarters at Minneapolis, Minnesota. It specializes in furnishing pre-cut house materials for persons willing to construct their own home. Defendant Land Contracts, Inc. of Iowa is a corporation formed and controlled by Miles Homes as a vehicle or agent to take real estate title in certain transactions in which Miles Homes has an interest. Executive officers for Land Contracts, Inc. are general counsel for Miles Homes. Northrups knew nothing of the latter corporation until that name appeared on instruments later recorded. Land Contracts, Inc. was not mentioned in the sales agreement. The sales agreement provided the $6874 "mortgage note" was to draw interest at six percent and was to be secured by an open-end mortgage.

On May 22, 1968, defendants caused a document entitled "Assignment of Land Contract" to be recorded in the Linn County Recorder's office. This instrument purported to assign plaintiffs' real estate interest as contract purchasers to Land Contracts, Inc. of Iowa. Plaintiffs claimed their signatures on this assignment were forgeries. The acknowledgment purportedly made before one June Ellingson, Miles Homes employee, in Hennepin County, Minnesota on April 24, 1968, was admittedly false. Neither did the Northrups know or ever see the "Judy Wheeler" whose name appears on the assignment as a witness to their signatures, nor was this person identified by anyone else.

The Northrups first knew of this assignment in July 1968 when the Linn County Assessor notified them in writing they had lost their homestead exemption because their homestead had been sold. Their numerous and frantic telephone calls to the agent, Pope, were ignored and unreturned.

On October 21, 1968 plaintiffs traveled to Minneapolis, Minnesota, the principal place of business of Miles Homes and Land Contracts, Inc. Their purpose was to attempt to straighten out their difficulties. They visited at length with one Casimer "Cash" J. Burzynski, manager. Plaintiffs contend, at that time, they signed only a "release" of the land contract assignment so their land would be placed back in their names.

On or about October 25, 1968, Northrups received a letter from Miles Homes, writ-

ten by Burzynski as manager, stating he was enclosing "a copy of the Release of Assignment of Land Contract and the copy of the Real Estate Contract."

The "release" enclosed evidently did not refer to the Northrup-Miles Homes deal, but to an unrelated transaction. Klara, anxiety-ridden, again went to the Linn County Recorder's office. She found there recorded a second "Assignment of Land Contract" to Land Contracts, Inc.; a "Real Estate Contract—Installments," from Land Contracts, Inc. to Northrups for $15,165.-20; and a "Real Estate Mortgage" to Miles Homes for $6874 but open-ended to $20,000. All these instruments were notarized by Burzynski in Minnesota. Plaintiffs testified the only instrument they signed while in Minneapolis was a "Release of Land Contract." There was also of record a prior real estate mortgage from Northrups to Miles Homes for $6874, dated April 24, 1968, and purportedly acknowledged before June Ellingson on that date, in Minnesota.

There was ample evidence from which the jury could have found that following the receipt of notice of loss of homestead exemption Klara Northrup suffered mental anguish occasioned by the fright and fear of having lost the equity in their real estate. She cried frequently, broke down on occasions at the courthouse, lost 40 pounds of weight, consulted a doctor, received medication for her nerves, and suffered abdominal pains and cramps. On one occasion she was forced to sit on some steps along a downtown street, vomiting, while her husband went for a car to take her to a hospital for emergency room treatment.

The first division of plaintiffs' petition was for damages in the amount of $5000 for breach of express and implied warranties of fitness and quality with respect to materials furnished under the contract. In the second division plaintiffs alleged defendants had willfully and maliciously forged plaintiffs' signatures to the various described instruments affecting their real estate and had caused false notarial acknowledgments to be affixed thereto, all to defraud them of their equity rights in said property. Plaintiffs further alleged mental anguish and medical expense incurred as a result and prayed for $10,000 actual and $15,000 punitive damages for Klara Northrup.

The jury trial, commencing October 26, 1970, resulted in a verdict of $3500 in favor of Oliver and Klara on the division I breach of warranty claim; and a verdict for Klara for $5000 actual damages and $15,000 punitive damages on the division II claim. Appealing, defendants assign errors which shall be treated in subsequent divisions of this opinion.

I. *Similar transactions.*

By motion in limine defendants moved the court to forbid plaintiffs under any circumstances from referring to other business dealings between defendants and "other residents of Linn County and the results of said dealings." Trial court ruled it would not permit such evidence if it tended to prove a pattern of fraudulent inducement to secure signatures of witnesses on certain instruments, however,

"I will permit evidence of other transactions in which other witnesses had their names forged to documents by the Defendants as bearing upon the question of intent. I will permit evidence that June Ellingson, the notary public, did make or did take acknowledgements on other documents of other witnesses when they did not in fact appear before her * * *. I am basing my ruling on the theory that the issue before this Court at this time is a question of forgery."

Failure of trial court to sustain the motion in its entirety, followed by evidence of similar conduct and claimed forgeries, is assigned as prejudicial error.

Such evidence of similar transactions was, in the court's own language, allowed on the ground it had bearing on the issue

of intent to commit forgery. Trial court apparently was relying on the following rule articulated in 32 C.J.S. Evidence § 580, at pp. 708–709:

"[E]vidence of similar acts may frequently be relevant, especially in actions based on fraud and deceit, because of the light which it throws on the state of mind of a person, as, for example, his knowledge, or because of the insight which such evidence of similar acts may provide into such person's motive or intent * * *."

■ Civil trial admissibility of similar acts is basically a question of practicality involving the inconvenience of trying collateral issues. See 32 C.J.S. Evidence § 578, at p. 703. The determination of the relevancy and similarity of other acts is for the trial court within its exercise of sound judicial discretion. See Davis v. L & W Construction Company, 176 N.W.2d 223 (Iowa 1970). No one disputes the similarity of the other transactions testified to in this case. The other false acknowledgments were obviously relevant to the other alleged forgeries, which arguably bore on the issue of intent involved in the case at bar. We therefore hold the wide discretion of the trial court was not abused in partially overruling defendants' motion in limine.

## II. *Measure of damages.*

■ Defendants now complain plaintiffs' petition stated an improper measure of damages for the breach of warranty, " * * * being the difference between the value of the plaintiffs' home now and what it would have been had defendants not breached said expressed and implied warranties of fitness and quality."

Defendants concede, however, trial court's instructions properly set forth the true measure of damages:

"The measure of damages for breach of an express or implied warranty is the difference between the fair and reasonable value of the goods as they were at the time of delivery to Plaintiffs and the fair and reasonable value they would have had if they had answered to the warranty."

See § 554.2714, The Code. Defendants took no exception to this instruction. It became the law of the case.

The following from Syester v. Banta, 257 Iowa 613, 626, 133 N.W.2d 666, 674 (1965) is controlling here:

"The fact that plaintiff asked for something beyond the correct measure of damage is not reversible error if * * * the court properly instructed the jury."

The evidence was directed to the measure of damages contained in trial court's instructions, not in plaintiffs' petition.

There is no merit in this error argued by defendants.

## III. *Competency of witness to testify on breach of warranty.*

■ Oliver was questioned concerning the fair value of the materials obtained from Miles Homes. Defendants objected there was no foundation laid and that Oliver was not competent to testify to the value. The objection was overruled. It developed the question confused the witness, and it was thereafter reframed without this objection being interposed. In any event and without resort to the failure of defendants to preserve the error, we hold Oliver was competent to testify on this issue.

Defendants concede the owner of personal property is generally competent to testify as to its value. See Johnson v. Scott, 258 Iowa 1267, 142 N.W.2d 460 (1966); Reed v. Bunger, 255 Iowa 322, 122 N.W.2d 290 (1963). But defendants argue before the owner so testifies he must affirmatively establish he has knowledge of value. Assuming, without deciding, this

to be true, we believe plaintiff adequately showed his knowledge of value. Before testifying about value Oliver testified he had worked as a laborer in constructing residential housing, and had purchased materials locally to replace materials not delivered or delivered in inferior condition by Miles Homes. Defendants concede Oliver's skill as a builder was demonstrated in the house construction. We hold all this was minimally sufficient to establish a foundation to inquire of Oliver about the value of building materials received.

■ Defendants argue further, "In question of damages here the injury complained of consists of distinct elements, it is not competent to ask a witness to make a general estimate of damages, but he should be asked to make a list of specific items separately." Prior to testifying as to the fair and reasonable value of the materials delivered, Oliver had testified in detail certain materials, including rafters, floor joists, stairwell, sheeting, electrical items, plumbing items, and hot water system boiler, were defective, inferior, or missing. He also described defendants' novel method of unloading material upon delivery, in which the truck was accelerated backwards and suddenly stopped, projecting the components off the truck to the ground. In these circumstances we hold it was within trial court's discretion to permit the witness, after he had stated he had been damaged and in what particulars, to then state the value of all the materials delivered to him and the value the materials would have had if they had been as warranted. The amount the witness affixed to each individual item was properly left to be developed on cross-examination. See Dougherty v. Stewart, 43 Iowa 648 (1876).

IV. *Sufficiency of proof of defective materials.*

■ Nor do we agree with defendants that trial court erred in not withdrawing from the jury the issue that defendants furnished to plaintiffs materials of an inferior grade and quality, thus causing damage to plaintiffs. Some of the evidence as to quality of the components has been already noted. Many other specific defective or missing items were testified to. The kitchen cabinets were never furnished. When the bands on the shipped lumber were broken it "went in all directions" because it was warped and twisted. The "pre-cut" lumber required alterations to make it fit. Oliver testified because of these many defects he spent 800 additional hours in house construction and that the reasonable value of his time was three and a half or four dollars per hour.

■ On the damage issue, defendants have ignored the principle so often enunciated by this court, and most recently in Patterson v. Patterson, 189 N.W.2d 601, 605 (Iowa 1971):

"Courts have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated."

We hold this assignment of error is without merit.

V. *Forgery.*

■ Neither do we agree trial court should have withdrawn the forgery issue from the jury. Plaintiffs testified their signatures on certain of the crucial instruments were forged. Defendants countered by producing a handwriting expert who admittedly had spent little time in the examination of the questioned documents. Under our decisions it is well established expert opinion testimony is not binding on the jury but may be accepted or rejected, in whole or in part. Olson v. Katz, 201 N.W.2d 478 (Iowa 1972).

The following testimony of the expert witness, even prior to the recent imbroglio involving the spurious Howard Hughes autobiography, may have adversely affected the jury:

"Handwriting examination is an exact science. Competent handwriting analysts or examiners do not make mistakes. * * * To my knowledge I never make mistakes. No one has ever proved to me I made a mistake. I have never been in cases where two qualified experts have taken opposite opinions. * * * Two qualified experts would not take opposite opinions."

Documents bearing plaintiffs' admittedly genuine signatures and ones bearing the allegedly forged signatures were received into evidence for consideration by the jury. This was in accordance with § 622.25, The Code, which provides, "Evidence respecting handwriting may be given * * * by comparison by the jury with writings of the same person which are proved to be genuine." Plaintiffs established certain of the documents bore false acknowledgments by a notary public employed by Miles Homes. This plainly corroborated the other evidence of forgery. There was substantial evidence to support the jury's finding that plaintiffs' signatures were forged. Trial court did not err in refusing to withdraw the forgery issue from the jury's consideration.

### VI. *Exemplary damages.*

■ In regard to exemplary damages defendants first argue such damages may not be assessed against a corporate entity. At one time it may have been thought a corporation, as an artificial person, was incapable of malicious intent, and consequently could not be assessed exemplary damages. See 19 Am.Jur.2d, Corporations § 1428, at p. 823. However, it is now well settled a corporation may be liable for exemplary damages for the wrongful acts of its agents. 22 Am.Jur.2d, Damages § 260,

at p. 354; 19 C.J.S. Corporations § 1286(a), p. 964; see Amos v. Prom, 115 F.Supp. 127 (N.D.Iowa 1953); Ashland v. Lapiner Motor Company, 247 Iowa 596, 75 N.W.2d 357 (1956); White v. International Text-Book Co., 173 Iowa 192, 155 N.W. 298 (1915); 19 Am.Jur.2d, Corporations § 1428, at p. 823; 19 C.J.S. Corporations § 1263, at p. 948.

Although this court has never specifically adopted the prevailing rule, the following paragraph from Claude v. Weaver Construction Company, 261 Iowa 1225, 1233, 158 N.W.2d 139, 145 (1968) is pertinent:

"Error asserted in the case at bar is broad, but liability of a corporate entity, for punitive damages, is neither urged nor discussed by defendant. As a result we are not here called upon to consider or resolve that issue and do not do so. Stated otherwise, the question as to liability of a corporation for exemplary damages is not involved in this appeal. However, with regard to the foregoing see Baltimore & P. R. Co. v. Fifth Baptist Church, 108 U.S. 317, 2 S.Ct. 719, 726–727, 27 L.Ed. 739; Kelite Products v. Binzel (5 Cir.), 224 F.2d 131, 144; Amos v. Prom, D.C., 115 F.Supp. 127, 137; Toole v. Richardson-Merrell, Inc., 251 Cal.App.2d 689, 60 Cal.Rptr. 398, 414–415; Algozino v. Welch Fruit Products Co., 345 Ill.App. 135, 102 N.E.2d 555, 560; 25 C.J.S. Damages § 125(4), page 1153; 19 C.J.S. Corporations § 1263, page 948; 39 Am.Jur., Nuisances, Section 32, page 313; 13 Am.Jur., Corporations, section 1130, page 1056; and Prosser, Law of Torts, Third Ed., Hornbook Series, page 12."

The result in *Claude* (affirmance of an award of exemplary damages against a corporation) and the above quoted language, coupled with an examination of the cited authorities, clearly indicates the movement of this court toward the prevailing rule. We now hold that a corporation may be assessed exemplary damages.

▬ Of course, to recover exemplary damages from a corporation for wrongful acts of its employees, the employees must have been acting within the course of, or in connection with, their duties or employment. Defendants argue on appeal there was no showing the employees were acting within the course of their employment. A careful review of the entire record discloses sufficient facts from which a jury could reasonably infer the forgeries were committed by employees or agents of the corporate defendants in connection with their employment. However, our disposition of defendants' argument need not rest on this ground alone, for it suffers from a more fatal flaw. Defendants never specifically raised the scope of employment issue in trial court by pleading, motion, objection, or requested instruction. Their defense was based on the theory there were no forgeries. We need not consider an issue not raised at trial, although as a matter of grace we have done so. See, e. g., In re Estate of Stonebrook, 258 Iowa 1062, 141 N.W.2d 531 (1966); Denny v. Jacobson, 243 Iowa 1383, 55 N.W.2d 568 (1952).

▬ Defendants argue there was no evidence of malice which would justify an award of punitive damages. We disagree. Analyzing the Iowa decisions, Judge Graven in Amos v. Prom, supra, indicated exemplary damages have been permitted in this state based on fraud, malice, gross negligence or an illegal act. The careful summary of the development of the phase of our law pertinent here (loc. cit. 115 F. Supp. 136–137) was quoted and applied by the Iowa Supreme Court in Syester v. Banta, 257 Iowa 613, 628–629, 133 N.W.2d 666, 676 (1965):

" 'The rule would seem to be: exemplary damages may be awarded where defendant acts maliciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feeling toward the person injured, and is in fact consistent with a complete indifference on the part of defendant, liability for exemplary damages is not based upon the maliciousness of the defendant but is based, rather, upon the separate substantive principle that illegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused.' "

It was this theory of law trial court incorporated in his jury instructions. Trial court instructed the jury that a willful and malicious act was one " * * * done in such a manner and under such circumstances as to show heedlessness and an utter disregard and abandonment as to what result may flow from the doing of an act or from the manner in which it is done." Defendants took no exception to the instruction. It was an accurate statement of law. "A willful wrong may be committed without any intention to injure anyone." Blakeley v. Shortal's Estate, 236 Iowa 787, 792, 20 N.W.2d 28, 31 (1945). Exemplary damages may be awarded where it appears the defendant is guilty of fraud. Syester v. Banta, supra. Evidence of fraud or malice is rarely direct; it may be circumstantial. See First Nat. Bank v. Hartsock, 202 Iowa 603, 210 N.W. 919 (1926); First Congregational Church v. Terry, 130 Iowa 513, 107 N.W. 305 (1906); 1 Jones on Evidence § 5:21, at p. 593 (6th ed. 1972).

▬ From the facts and circumstances in evidence in this case reasonable men could certainly infer that defendants acted in utter disregard and abandonment as to natural consequences of their acts and rights of others.

No one is here contending forgery is not a wrongful act. The anxiety of Klara for fear plaintiffs had lost the equity in their homestead permeates this record. The signature-forged instruments gave defendants every available legal advantage over plaintiffs.

The sales contract plaintiffs executed provided defendant Miles Homes was to

have an "open end" mortgage to secure the purchase price of $6874. But filed of record were the following instruments the jury found to be signature-forged: a real estate installment contract from Land Contracts, Inc. of Iowa to Northrups for $15,167.20; a real estate mortgage to Miles Homes for $6874; a second real estate mortgage to Miles Homes for $6874 open-ended to $20,000; two separate assignments of Northrups' real estate purchase contract from Northrups to Land Contracts, Inc., one dated April 24, 1968, the second dated October 21, 1968. By these instruments, assuming the forgeries were not proved, defendants acquired the means to enforce their claim against plaintiffs for the full padded obligation claimed due from them, not merely the $6874 stipulated in the contract.

Trial court did not err in not withdrawing the issue of exemplary damages from the jury.

VII. *Failure to grant motion for judgment notwithstanding verdict.*

Defendants contend their motion for such judgment should have been granted because plaintiffs failed to sustain their burden of proof regarding breach of warranty, and damages from said breach or from the forgery.

■ Findings of fact in a law action are binding upon this court if supported by substantial evidence. Rule 344(f)(1), Rules of Civil Procedure. There was substantial evidence here that defendants breached their warranties, caused the damages alleged, and forged plaintiffs' signatures to legal instruments.

■ The basic claim for Klara for mental and emotional harm is a well recognized separate cause of action in this jurisdiction. See Amos v. Prom, 115 F.Supp. 127 (N.D.Iowa 1953); Curnett v. Wolf, 244 Iowa 683, 57 N.W.2d 915 (1953); McVay v. Carpe, 238 Iowa 1131, 29 N.W.

2d 582 (1947); Blakeley v. Shortal's Estate, 236 Iowa 787, 20 N.W.2d 28 (1945). The record is replete with evidence of the causal relationship between the acts of defendants and the injury to Klara Northrup. There is evidence of out of pocket loss in the form of hospital bills and loss of homestead exemption for one year suffered by plaintiffs as a result of the wrongful acts of defendants. There is substantial evidence of the mental pain and anguish suffered by Klara. Placing a dollar amount on that injury is peculiarly a function of the jury. See Mazur v. Grantham, 255 Iowa 1292, 125 N.W.2d 807 (1964). There was substantial evidence to support the amount of actual damages awarded by the jury on the emotional-harm claim.

■ It is not the court's function to weigh or test the credibility of testimony. We need only determine there was substantial evidence to support the verdict. We have done so. Trial court did not err in failing to direct a verdict for defendants. Therefore, it did not err in overruling defendants' motion for judgment notwithstanding the verdict. See rule 243(b), R.C.P.

VIII. *Failure to grant new trial.*

Finally, defendants argue trial court should have sustained their motion for new trial because the jury obviously failed to comprehend the evidence and the verdicts were the result of passion and prejudice.

■ We agree with trial court's finding on the post-verdict motions that here the jury did in fact fairly respond to the issues and the evidence. The verdicts do not indicate the damages fixed by the jury were excessive.

On the breach of warranty claim the jury awarded plaintiffs $3500 instead of the full $5000 prayed for. On the emotional-harm claim the jury awarded only $5000 actual damages instead of the full $10,000 prayed for. If the verdicts were

the result of passion and prejudice, and intended by the jury as punishment, it is likely the jury would have awarded the full amount allowable under the pleadings and instructions.

 Defendants argue the verdicts failed to administer substantial justice. Trial court has wide discretion in ruling on a motion for new trial in the interest of justice, and this court will not disturb that ruling unless it is reasonably clear there was an abuse of discretion. Rule 344(f)(3), R.C.P.; Smith v. Ullerich, 259 Iowa 797, 145 N.W.2d 1 (1966). Where, as here, the disputes are principally factual, and there is substantial evidence to support the jury's determination of these facts, the judge should not grant a new trial merely because reasonable men might disagree with the jury's conclusion. See Lantz v. Cook, 256 Iowa 409, 127 N.W.2d 675 (1964). For trial court to grant a new trial in interest of justice, there must be some reason that fairly appears in the record. Smith v. Ullerich, supra. No such reasons appear in the record before us.

 Trial court had the opportunity to view the witnesses and observe the conduct of the parties throughout the course of the trial. Although we interfere more reluctantly with the grant of a new trial than with denial of a new trial, this does not mean that trial court has no discretion to deny a new trial. Hahn v. Graham, 256 Iowa 713, 128 N.W.2d 886 (1964). The jury verdicts and awards of damages were well within the permissible range of the evidence. Trial court did not abuse its discretion in denying defendants a new trial.

IX. *Excessiveness of exemplary damages.*

In regard to the alleged excessiveness of the award of exemplary damages we note that trial court instructed jury that there was no exact rule for computing the amount of exemplary damages and "You are not obliged to award any exemplary damages and you are the sole judges as to whether or not such damages shall be awarded and the amount thereof * *."

"In no event may you allow the Plaintiff Klara Northrup as exemplary damages more than $15,000, the sum prayed for in her petition * * *." Defendants took no exception to the instruction, nor did they request any supplemental instruction.

 Exemplary damages are in no way intended to be compensatory. There is no set mathematical ratio between actual and exemplary damages. Syester v. Banta, supra. Exemplary damages are intended to punish the defendant and deter others from similar wrongdoing. Claude v. Weaver Construction Company, supra; Syester v. Banta, supra. To be effective in this purpose the exemplary damages awarded must be relatively large. Although precedents are of little value in determining the excessiveness of awards, we note that in Syester v. Banta, supra, a jury verdict for $40,000 punitive damages and $14,300 actual damages was sustained. In Union Mill Co. v. Prenzler, 100 Iowa 540, 69 N.W. 876 (1897) the court sustained an award of $777.06 compensatory damages and $5000 exemplary damages. In the instant case the jury awarded $15,000 exemplary damages and $5000 actual damages on the emotional-harm claim. The $15,000 does not shock our conscience, nor do we believe it to be excessive in light of the despicable conduct of defendants. The amount of exemplary damages is peculiarly within jury's discretion. Boyle v. Bornholtz, 224 Iowa 90, 275 N.W. 479 (1937). No remittitur is permitted in this state if punitive damages awarded are found to be excessive. Claude v. Weaver Construction Company, supra. As these damages allowed here were not excessive, trial court did not err in refusing to set aside the award of exemplary damages. See Boise Dodge, Inc. v. Clark, 92 Idaho 902, 453 P. 2d 551 (1969).

X. We have carefully examined the record and certified exhibits, and considered all of defendants' arguments and brief

points whether discussed above or not. We find no error and consequently the judgment below is affirmed.

Affirmed.